UNITED STATES of America, Appellee,

v.

Gilberto QUEJADA–ZURIQUE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Franklin MOSQUEROS–SANCHEZ,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jorge Miller PAZ–PEREZ, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Luis Felipe ROVIRA–CARDONA,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Roque GALLOR–ARIZA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Aracelio Raudel Morejon ORTEGA,
Defendant, Appellant.

Nos. 82–1764 to 82–1768, 82–1782.

United States Court of Appeals,
First Circuit.

Argued April 4, 1983.

Decided June 1, 1983.

David W. Roman, Asst. Federal Public Defender, with whom Gerardo Ortiz Del Rivero, Federal Public Defender, San Juan, P.R., was on brief, for Gilberto Quejada-Zurique, Franklin Mosqueros-Sanchez, Jorge Miller Paz-Perez, Luis Felipe Rovira-Cardona and Roque Gallor-Ariza.

Eduardo Caballero Reyes, Hato Rey, P.R., for Aracelio Raudel Morejon Ortega.

Charles E. Fitzwilliam, with whom Daniel F. Lopez Romo, U.S. Atty., and Everett M. De Jesus, Asst. U.S. Atty., Hato Rey, P.R., were on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

The six crewmembers of the M/V BENNY appeal from convictions of aiding and abetting the possession, with intent to distribute, of marijuana. See 21 U.S.C. § 955a(a). The captain of the vessel pled guilty to the same charge and received a three-year sentence. Appellants, all Colombian nationals, were found guilty by a jury. Because of the death of the district judge who had presided at their trial, a different judge sentenced them. On five of the defendants, he imposed four-year prison terms and special parole terms of two years, and on the sixth he imposed a five-year prison term plus the two-year parole. Appellants contend that the evidence was insufficient to support their convictions and that they were penalized for exercising their constitutional right to a jury trial. We affirm.

During the early morning of June 4, 1982, a United States Coast Guard cutter came across the unlit BENNY sitting dead in the water some 350 miles northwest of Puerto Rico. Apparently the vessel had been having engine trouble for eight days but had not sought assistance. No radio contact was established and communication was by shouting back and forth. The Coast Guardsmen were told, apparently by the captain, that the BENNY was of Honduran registry, had sailed from Honduras with a load of coffee, and was bound for the Bahamas. Permission to board was refused, and the Coast Guard then radioed for permission through diplomatic channels. Meanwhile, the cutter again initiated contact with the BENNY and was told that the captain was asleep. The crewmembers then "turned their backs" on the cutter, and there was no communication until the next morning, when the Coast Guardsmen were told the captain was not on board at all. One crewmember on the cutter testified that during this period he detected a strong odor of marijuana wafting over from the BENNY.

The standoff continued when the Coast Guardsmen asked to see the BENNY's registration. A crewmember held up a pink sheet of paper and offered a four-digit number as the registration number of the vessel. The Coast Guardsmen were then certain that the claim of Honduran registry was false, as all Honduran registrations contain letters as well as numbers. The Honduran government later confirmed that the BENNY was not registered. Upon learning this, the crew of the cutter boarded it as a stateless vessel. Members of the boarding party detected a strong odor of marijuana. They opened the hatches to the two holds and discovered what proved to be 22,000 pounds of marijuana.

The BENNY is a 60-foot, steel-hulled vessel with two holds, one forward and one aft with the engine room between. The living quarters are only twelve feet square, and there was testimony that the sleeping facilities were inadequate for the crew of seven found aboard. The holds are entered through on-deck hatches with steel covers. There was conflicting testimony as to whether the holds can be entered through the engine room or only from above. The holds are windowless. When the Coast Guard officers boarded, the covers were on both holds. One was secured by a line, but neither was locked, nor were they sealed in any way.

## I. SUFFICIENCY OF THE EVIDENCE

Defendants moved for a judgment of acquittal at the close of the government's case and again at the close of all the evidence. The motions were denied. In reviewing these rulings, we regard the evidence, including all inferences that may reasonably be drawn therefrom, in the light most favorable to the government. *United States v. Fortes,* 619 F.2d 108, 122 (1st Cir.1980). We must determine whether a reasonable jury, so viewing the evidence, could find guilt beyond a reasonable doubt. *Id.* The evidence need not exclude every reasonable hypothesis of innocence, *United States v. Smith,* 680 F.2d 255, 259 (1st Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983), and if it can support varying reasonable interpretations, the jury is entitled to choose among them, *United States v. Klein,* 522 F.2d 296, 302 (1st Cir. 1975).

The government was required to prove that appellants participated in the venture and sought by their actions to make it succeed. Mere presence at the scene or even knowledge that the crime is being committed is generally insufficient to establish aiding and abetting. *United States v. Tarr,* 589 F.2d 55, 59 (1st Cir.1978). "The vital element to be proven is that the aider and abettor shared in the principal's essential criminal intent. This may be inferred from the attendant facts and circumstances." *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir.1982).

Appellants contend that the government failed to prove the requisite knowledge and intent. They claim that, at least when they signed on, they had no idea that the boat contained marijuana; that they were hired for $160, to be paid on return, by a person whom they did not know how to locate; that they came on board only after the ship had been loaded; and that they were told the cargo was coffee. Therefore, the argument runs, they have been convicted for mere presence rather than knowing participation.

An analogous argument was accepted in this Circuit on one occasion, but in very different circumstances. In *United States v. Francomano,* 554 F.2d 483 (1st Cir.1977), a 50-pound package of marijuana was cast overboard from an otherwise drug-free sailing vessel heading to Europe to participate in races. We reversed the convictions of several "young men, short of funds, seeking travel for educational experience and adventure," who had sought passage without success on other boats before joining the crew of this 70-foot schooner. We found insufficient facts from which to infer their knowledge of the relatively small quantity of marijuana or participation in any importation scheme. In *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978), we overturned the conviction of a passenger on the same vessel because "[t]he Government's entire proof consisted of Mehtala's presence on the ship throughout the voyage and inferences of a close relationship with the ... captain." *Id.* at 10. Appellants' claim finds somewhat greater support in a few Fifth Circuit cases. *United States v. Bland,* 653 F.2d 989 (5th Cir.1981) (affirming convictions of captains of two boats, but reversing as to crewmembers of tug towing marijuana-laden barge because "the government failed to introduce any evidence that the crew members knew that the barge ... was carrying marijuana"); *United States v. Willis,* 639 F.2d 1335 (5th Cir.1981) (reversing convictions where government had offered "no evidence to support an inference that the two crewmembers knew that the hold contained marijuana"). *See also United States v. Cadena,* 585 F.2d 1252, 1267–71 (5th Cir.1978) (Skelton, J., dissenting).

Most frequently, however, courts have found that such factors as the length of the voyage, the amount of the marijuana on board, and the necessarily close relationship of those on board—factors which distinguish the cases cited above—support an inference of knowing participation by the crewmembers. In *United States v. Smith,* for example, we noted that "[n]either juries nor judges are required to divorce themselves of common sense," and found that appellant's portrayal of himself as a by-

stander was "inherently unbelievable." 680 F.2d at 260. Recent cases rejecting similar sufficiency of the evidence arguments include *United States v. Michelena-Orovio,* 702 F.2d 496 (5th Cir.1983) (strong odor, 5-day voyage, 12 tons of marijuana on 75-foot boat, running lights reversed, crewmembers conceal identity of captain); *United States v. Bent,* 702 F.2d 210 (11th Cir. 1983) (2- to 4-day voyage, 8 crewmen, 6,520 pounds of marijuana, 60-foot boat, marijuana in various places on boat, evidence of recent offload of marijuana); *United States v. Martinez,* 700 F.2d 1358 (11th Cir.1983) (13 crewmembers, 75-foot boat, 13 tons of marijuana, strong odor); *United States v. Sockwell,* 699 F.2d 213 (5th Cir.1983); *United States v. Munoz,* 692 F.2d 116 (11th Cir.1982), *amending* 681 F.2d 1372; *United States v. Glen-Archila,* 677 F.2d 809 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982); *United States v. Mazyak,* 650 F.2d 788 (5th Cir.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *United States v. DeWeese,* 632 F.2d 1267 (5th Cir.1980); *United States v. Alfrey,* 620 F.2d 551 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). These cases have focused particularly on three factors: the length of the voyage, the amount of marijuana on board, and the closeness of the relationship, often inferred from the size of the quarters, between captain and crew. The Eleventh Circuit views it as "well-established that where crewmen are found aboard a vessel upon which the presence of contraband is obvious, their conspiracy is inferrable," *United States v. Martinez,* 700 F.2d at 1366, and has noted that "the burden on the United States to establish the participation by any crew member on a ship heavily laden with marijuana over a period of several days ... is relatively light," *United States v. Munoz,* 692 F.2d at 118. *See also United States v. Bent,* 702 F.2d at 214 (government's task "relatively easy").

Unlike the unique situation in *Francomano,* this is a case where there was more than enough evidence from which the jury could conclude that appellants were aware of the marijuana on board and the illicit purpose of the voyage. First, both defendants who took the stand conceded that, at least when the engine trouble began, the captain informed them of the presence of the marijuana aboard. Second, there was testimony that one of the holds was accessible from the engine room, and that open bags of marijuana were lying about near the entry. Third, the boat was crammed full of 22,000 pounds of marijuana, a far cry from the 50 pounds on board in *Francomano.* One Coast Guardsman testified that the odor was noticeable 50 feet downwind, and all stated that it was extremely strong on board. While the Coast Guardsmen had special training in recognizing the smell of marijuana, and there was no explicit evidence of similar knowledge on the part of appellants, there was testimony that the smell is altogether different from that of coffee. Fourth, the living quarters were cramped and inadequate; there was little room on board for secrets. Finally, the jury could have drawn inferences that appellants had been brought along to unload (there was testimony that the crew was larger than necessary simply to sail the vessel, and the large quantity of marijuana would necessitate a gang of men to unload it), and that the captain would have made certain in advance of his crew's cooperation. In short, there was ample evidence from which the jury, which viewed the boat itself, could have concluded that appellants were aware that eleven tons of marijuana were on board.

Appellants argue that even if the jury could infer that they knew of the illegality at the time the vessel was seized, this does not show their knowledge at the beginning of the voyage, when they could still have withdrawn. This contention is unpersuasive. First, there is little precedent for such a finespun distinction.[1] Courts ordi-

---

1. We have found two cases that consider, but are unpersuaded by, such a distinction. *United States v. Munoz,* 692 F.2d at 118; *United States v. Cadena,* 585 F.2d 1252, 1265–66 (5th Cir.1978). Both courts noted the absence of

narily look only to the evidence of the defendants' knowledge while on board. The government can hardly be expected to present direct evidence of what occurred before the voyage began; defendants' later knowledge suggests earlier knowledge also. Second, appellants' lack of cooperation with the Coast Guard was in itself a knowing and uncoerced act in furtherance of the smuggling. If they did in fact lack the requisite guilty intent, they could, notwithstanding possible orders from the captain, have welcomed the Coast Guard aboard. Instead, they lied about the vessel's registration and the absence of the captain, "turned their backs on" the cutter, and repeatedly refused permission to board. Third, the jury could reasonably have inferred that the captain would have been open about the venture from the first, so as to ensure the continuing cooperation of the crew when it became necessary to deliver the cargo. It might also have inferred that if appellants had really learned of the marijuana only once at sea they would have at least made some effort to abort the enterprise. Although two defendants testified that they were upset at being duped, the appellants apparently "made no effort to complain or to protest or to notify anybody that [they] wished to have no part or further participation in the vessel's mission." *United States v. Munoz,* 692 F.2d at 118. Finally, the only evidence that appellants did not know the purpose of the voyage when it commenced came from the two who testified. The jury was not obliged to credit this testimony. *See United States v. Cadena,* 585 F.2d at 1265–66 & n. 31. In denying the motions for acquittal the trial judge commented that he considered this testimony "hard to believe." [2] If the jury disbelieved the defendants' story, it could have concluded that the fabrication was all the more evidence of consciousness of guilt. *See United States v. Smith,* 680 F.2d at 260.

In sum, the government established more than mere presence. This is not a case where, on the basis of association alone, the jurors were asked "to let their imaginations run rampant." *Cf. United States v. Mora,* 598 F.2d 682, 684 (1st Cir.1979). The evidence, which need not have excluded every possible hypothesis of innocence, was adequate to support the convictions.

## II. SENTENCE DISPARITY

The captain of the BENNY pled guilty and was sentenced to three years in prison and a special three-year parole term. Appellants, who proceeded to trial, were sentenced by a different judge than the captain. Five received four-year prison terms and the sixth a five-year term; all were given a two-year special parole term as well. They now assert that these events created the appearance of vindictiveness, violated their due process rights, and require remand for resentencing.

The short answer to this contention is that the sentences, all of which were within statutory limits, were imposed by two different judges, each with discretion to choose the sentence he deemed appropriate. This is an adequate explanation for the disparity and eliminates any possible appearance of vindictiveness.

Even, moreover, if the sentences had been handed down by the same judge, and even were we to assume that the captain received a reduced sentence for pleading guilty, we would not find a constitutional violation. The defendant who opts to go to trial rather than negotiating a plea runs the risk of a harsher sentence than he would have received by pleading guilty. "While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978) (quoting *Chaffin v.*

evidence tending to show innocent beginnings or subsequent objection.

2. We note, for example, one defendant's description of June 4, 1982, as "the day they caught us."

*Stynchcombe,* 412 U.S. 17, 31, 93 S.Ct. 1977, 1985, 36 L.Ed.2d 714 (1973)).

*Affirmed.*